UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL C. WUSSOW

        Plaintiff,


v.

                                     Case No.     16-CV-444

BRUKER CORPORATION,
BRUKER NANO, INC., MICHAEL
SZULCZEWSKI, and STEPHEN MINNE

        Defendants.

## COMPLAINT

NOW COMES the plaintiff, Michael C. Wussow, by his undersigned attorneys, and as and for a complaint against the defendants denominated above states as follows:

### NATURE OF THE CASE

1. This is an action seeking to redress discriminatory employment action taken against plaintiff Michael C. Wussow in violation of 18 U.S.C. § 1514A and 15 U.S.C. § 78u--6(h)(1)(A)(iii).

### PARTIES

2. Plaintiff Michael C. Wussow is an adult who resides at 3110

Waucheeta Trail, Madison, WI 53711. Until his termination on July 28, 2015, Wussow was Director of Product Line Management for the Fluorescence Microscopy Business Unit ("FMBU") of defendant Bruker Nano, Inc.

3.   Defendant Bruker Nano, Inc. ("Bruker Nano"), headquartered in Santa Barbara, California, is a wholly owned subsidiary of defendant Bruker Corporation. Bruker Nano is comprised of various business units including the FMBU, which is located at 3030 Laura Lane, Suite 140, Middleton, WI 53562-0677. Bruker Nano's financial information is included in the consolidated financial statements of its parent, defendant Bruker Corporation, and Bruker Nano is a publicly traded company within the meaning of 18 U.S.C. § 1514A(a).

4.   Defendant, Bruker Corporation ("Bruker"), headquartered in Billerica, MA, is a $1.7 billion company that, together with its subsidiaries, designs, manufactures, sells, and services proprietary life science and materials research systems and associated products worldwide. Defendant Bruker is a publicly traded company within the meaning of 18 U.S.C. § 1514A(a).

5.   Defendant Michael Szulczewski, is an adult with a business address of 3030 Laura Lane, Suite 140, Middleton, WI 53562-0677. He was the founder and President of Prairie Technologies, Inc., which was acquired by Bruker on September 12, 2013 and became the FMBU.  Szulczewski was thereafter employed by defendants as General Manager of the FMBU and in that capacity was Wussow's direct supervisor. Defendant Szulczewski continued as the FMBU's General Manager until October 28, 2014, when he was reassigned to be

the FMBU's Chief Technology Officer with a special assignment to serve as its acting Operations and Service Manager.

6.   Defendant Stephen Minne, is an adult with a primary business address of 112 Robin Hill Road, Santa Barbara, CA 93117. Minne was employed by defendant Bruker as the Vice President of Business Development for the Bruker Materials Group, which included defendant Bruker Nano. On October 28, 2014, defendant Minne took over from defendant Szulczewski as General Manager of the FMBU, and in that capacity was Wussow's direct supervisor. On May 12, 2015, Minne was also made General Manager of the AFMi Business Unit ("AFMi"), which, along with the FMBU and several other business units, made up defendant Bruker's Nano Surfaces Division.

## JURISDICTION AND VENUE

7.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States, and pursuant to 18 U.S.C. § 1514A (b)(1)(B) and 15 U.S.C. § 78u-- 6(h)(1)(B)(i), which confer upon the district courts of the United States jurisdiction over whistleblower actions brought under the Sarbanes-Oxley Act of 2002 ("SOX") and the Dodd—Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd—Frank").

8.   The Western District of Wisconsin is the proper venue for this action under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

9.      Plaintiff Wussow began working as the FMBU's Director of Product Line Management in March 2014, reporting to its then General Manager, defendant Michael Szulczewski.

10.      In that position, plaintiff Wussow was responsible for management and development of the scientific instruments microscopy product line for the FMBU. He managed all aspects of the product development and marketing process for the products in that line, including product positioning and pricing, key benefits, and target customers. Wussow worked closely with the FMBU's engineering team on product development, with the manufacturing team on product transfer, and with the sales and marketing team on competition, unique selling points ("USP's"), value proposition for customers, product positioning, and sales strategies.

11.      As a regular and essential part of his performance of these duties, Wussow was involved in and closely monitored the contracting for and the scheduling and performance of the manufacture, delivery, and post-delivery installation and training services performed on specific "projects" involving academic or commercial customers' orders for the specialized microscopy equipment the FMBU produced and sold.

12.      This essential function of Wussow's position required him to be centrally involved in management discussions regarding the critical point or points in the manufacturing, delivery, and installation and training process at

4

which the FMBU would deem the revenue that was due from a customer for a particular project to be "recognized" by FMBU and, as a result, by defendants Bruker Nano and Bruker.

13.     Throughout his employment, Wussow participated in weekly manufacturing meetings, which were used to plan for inventory and manufacturing needs for upcoming orders, determine the exact equipment that would need to be produced to properly fulfill particular orders, and to provide the status of current orders both in the manufacturing process and the delivery and installation process.

14.     As he began attending these meetings, Wussow quickly became aware that the regular, stated policy of defendants Bruker and Bruker Nano-- which the FMBU was required to follow--was to "recognize" the revenue from a given project for accounting and financial reporting purposes only after the equipment manufactured for the customer had been both delivered to the customer and properly installed in working order, and the customer had then been trained, as necessary, in the use of the system and had formally indicated its "acceptance" of the system.

15.     Such formal customer acceptance, Wussow learned, was required to be accomplished by completion of a "Final Acceptance Form," which directly reflected the company's revenue "recognition" policy and which both an authorized representative of the customer and a Bruker employee were required to sign. In relevant part that form states:

<u>Acceptance Certification</u>

I, an authorized customer representative, acknowledge that the above referenced system was installed and demonstrated to operate in accordance with the specifications mutually agreed upon by both parties.   We accept delivery, installation, and demonstration of this product as complete and release Bruker NSB from any further obligation, other than those obligations as specified during the warranty period.

16.     After the customer had signed this acknowledgement, Wussow learned, the Final Acceptance Form was to be returned to the FMBU, which would in turn provide the Form to defendants Bruker and Bruker Nano's accounting department, which would then treat the revenue due from the customer for the ordered equipment and related services as "recognized" by defendants.

17.     The fact and extent of this formal "recognition" of revenue flowing to the FMBU for its microscopy equipment projects then became an important part of defendants' overall official accounting information, which defendant Bruker regularly reported both to the Securities Exchange Commission ("SEC") and, through such publicly available reports and other means, to members of the investing public.

18.     Defendant Bruker's regular, official reports on its financial performance to the SEC—which are required by the SEC and made publicly available by it for the express purpose of giving investors and financial professionals an accurate, detailed, and reliable view of publicly traded companies' financial performance and condition—also explicitly indicate that

defendants' customary revenue-recognition policy and practice, as reflected in the companies' Final Acceptance Form, adheres to both Generally Accepted Accounting Principles ("GAAP") and to the official GAAP-based revenue-recognition guidance for regulated companies promulgated by the SEC.

19.    For example, in defendant Bruker's annual, publicly available "Form 10-K" Report to the SEC, filed in February 2015, the company states that its "critical accounting policies"—those "most important to the portrayal of our financial position and results of operations"—recognize revenue only when four fundamental criteria, which are closely similar to those on which the SEC's own revenue-recognition guidance is also based, have been met:

> We recognize revenue system sales when persuasive evidence of an arrangement exists, the price is fixed or determinable, *title and risk of loss have been transferred to the customer* and collectability of the resulting receivable is reasonably assured. Title and risk of loss are generally transferred *upon customer acceptance for a system that has been delivered and installed.*

(Emphasis added.) The company's Form 10-K also states, however, that in circumstances where the price is *not* "fixed or determinable" or where "collectability" is *not* "reasonably assured," even customer "acceptance" after delivery and installation is not enough to justify recognition of a project's revenue, and such recognition must instead be "deferred until *cash is received.*" (Emphasis added.)

20.    While the SEC's own principles in some cases permit revenue to be at least partially recognized after delivery only, even in advance of actual

installation or customer acceptance, the SEC also makes clear that these latter steps *are* essential pre-requisites to revenue recognition in situations where installation and acceptance are called for by specific provisions in the parties' contract or by the vital importance to the product's usability, in the particular circumstances, of post-delivery installation and training.

21.     The FMBU's contractual agreements with its customers routinely included such specific requirements for installation and training prior to customer signing of the Final Acceptance Form. And because the equipment the FMBU supplies consists of highly complex and specially designed systems that are unique to each customer and available only from Bruker, proper installation and training by FMBU employees familiar with each particular system was "essential to the functionality" of the equipment delivered and was thus a necessary precondition to recognition of the resulting revenue within the meaning of the SEC's standards.

22.     As plaintiff Wussow also soon learned, however, the FMBU and many of its key managers and employees—under the direction of defendant Szulczewski and, after he became General Manager, defendant Minne as well—were routinely engaging in improper practices that were designed to permit recognition of revenue by the FMBU well before the actual installation of a system—and in some cases, even its complete delivery—had yet occurred, and that were therefore in direct violation of defendants' own stated policies and the revenue-recognition principles promulgated by the SEC.

23.     With the knowledge and complicity of their superiors in Bruker Nano and Bruker, defendants Szulczewski and Minne and other FMBU managers, to serve their own personal financial and career interests and their employers' corporate interests, and despite knowing their actions were wrong, pressured and forced subordinate employees to circumvent proper revenue recognition procedures in order to falsely and substantially overstate the actual revenue properly attributable to the FMBU, and thus to defendants Bruker Nano and Bruker, for specific accounting and financial reporting periods.

24.     Over the course of 16 months between his arrival in the FMBU in March 2014 and his termination on July 28, 2015, plaintiff Wussow repeatedly and explicitly urged his fellow employees not to engage in this misconduct and reported it to his superiors, refusing to participate in it himself and strenuously opposing and objecting to it in the reasonable belief that it constituted a violation of both defendants' own policies and procedures, of SEC rules and regulations, and of federal laws prohibiting various forms of securities and other fraud, as set forth in 18 U.S.C. § 1514A(a)(1).

25.     Throughout this period, defendants Bruker and Bruker Nano, through defendants Szulczewski and Minne and other agents, officials, and employees, were fully aware of plaintiff Wussow's reports and opposition to their improper revenue-recognition practices and of his concern, in doing so, that these practices could be found to constitute violations of federal law.

26.     Rather than investigating Wussow's reports, however, and

correcting these illegal practices, defendants instead dismissed or minimized his concerns and continued its wrongful revenue-recognition practices. When Wussow refused to relent and continued to oppose, refuse to participate, and report these practices to his supervisors and other Bruker and Bruker Nano employees with authority to investigate and correct this misconduct, defendants discriminated and retaliated against him because of his protected conduct, by berating him for his reports, stripping him of critical job functions in order to isolate him from further contact with defendants' continuing unlawful conduct, and ultimately by terminating his employment altogether.

**2014 -- Second Quarter (April – June 2014)**

27.     After his hire in March 2014, Wussow quickly became aware that defendant Szulczewski, in his capacity as General Manager of the FMBU, was directing its business manager, head of sales, and other key FMBU managers to do "whatever was necessary" to secure customer "sign-off" on systems—in the form of a signed Final Acceptance Form confirming the completion of the "delivery, installation, and demonstration" of the system—by the end of the companies' fiscal quarter, in order to recognize the project's revenue in that quarter, despite the fact that the system being produced for the customer had not yet been—or clearly would not be—actually installed or, in some cases, even delivered by the end of that quarter.

28.     Szulczewski was engaging in this conduct, Wussow, learned, because his own superiors at Bruker and Bruker Nano were putting intense

pressure on him to meet certain quarterly revenue targets and because the size of Szulczewski's "earn-out" payments for his sale to Bruker of Prairie Technologies was dependent on the FMBU's revenue performance under his management.

29.     As a result of Wussow's direct, regular involvement in the weekly manufacturing meetings and in all aspects of the sales, production, and product transfer processes, Wussow also discovered that FMBU managers and employees were regularly complying with defendants' demands to falsify the revenue-recognition process, by obtaining customer sign-offs and reporting the resulting revenue recognition well in advance of fiscal quarter in which delivery, installation, and/or training on the systems in question would actually occur.

30.     During one of the manufacturing meetings in June 2014, Wussow told the participants that getting customers to sign off on systems acceptance before actual delivery or installation, in this way, was a very serious matter and not an activity that they should be engaging in, because it was in violation of Bruker procedures, because it put FMBU's sales and installation employees in an awkward position, and because it directly impacted the accuracy and integrity of the financial reporting required of Bruker as a publicly traded company.

31.     In response, the FMBU's business manager, Beth Wolf, told Wussow that she would not engage in these practices on her own but that defendant Szulczewski was forcing her to do so. Similarly, the FMBU's head of sales, Mike Barrett, told Wussow that he was being forced to take these actions and "had no choice" but to comply with Szulczewski's demands.

32.     In a separate discussion with Wussow, however, John Rafter, who was in charge of world-wide applications for the FMBU and involved in every aspect of its operations, told Wussow that a company as large as Bruker would have no idea that its rules were being violated in this way i.e. that the business unit was getting customer sign-off for systems before installation and training, and that it was more important to bring in the revenue to make the FMBU look as successful as possible. Rafter made clear that he had no problem with Szulczewski's orders and he would himself get early customer signoff and instruct FMBU employees to get early customer signoff and assist them in doing so.

33.     Rafter made 'off the book' deals with customers in order to get them to place orders to achieve booking and revenue goals. He would promise them additional pieces of equipment, additional options, additional warranty, or additional training that the customer would not pay for as part of their order. He would then take the items from inventory without accounting for them, or only partially accounting for them. He had a collection of 'zero dollar' inventories he maintained in his office.

34.     Thus, when shipping delays prevented Bruker from delivering and installing a system ordered by India Institutes of Technology in June 2014, as originally planned, defendant Szulczewski ordered Wolf and Rafter to get the customer's sign-off on the system in advance of actual delivery and installation, in order to recognize its revenue by the close of the second quarter, at the end of

June. Rafter procured this early sign-off by promising additional equipment, support, and training to the customer, and the system revenue was recognized for the second quarter, even though delivery did not occur until after the quarter had closed and actual installation and training did not occur until mid-July 2014.

35.     Similarly, Wolf and Barrett were directed and had arranged to get final sign-off by Stanford University researcher James Marshel after his system's delivery on June 30, 2014, the last day of the second quarter, despite the fact that installation of the system could not be completed until much later due to incomplete renovations at the Stanford site. After the actual delivery then arrived in damaged boxes, precluding recognition in the second quarter, Marshel was again persuaded to sign off in advance of actual installation, permitting the FMBU to recognize the revenue in the third or fourth quarter of 2014 even though the eventual installation did not occur until the end of the first quarter of 2015.

**2014- Third Quarter (July – September 2014)**

36.     After defendant Szulczewski had decided to absent himself from critical Bruker Nano business strategy sessions in late summer 2014, the President of Bruker's Nano Surfaces Division, Mark Munch, assigned defendant Minne to work with the FMBU on its strategy planning. Because the FMBU's revenue performance was inadequate and Munch did not believe defendant Szulczewski's revenue forecast, plaintiff Wussow was instructed to meet with Szulczewski and head of sales Mike Barrett to review the FMBU's third-quarter

13

orders and projected revenue and to report back to Minne and Munch.

37.     In an August 5, 2014 meeting for that purpose, Szulczewski informed Wussow of his plans to meet revenue-recognition goals for the third quarter by again requiring FMBU staff members to obtain customer sign-offs on systems in that quarter despite the certainty that actual installation would not occur until after the third quarter had already closed.

38.     In response, Wussow told Szulczewski that he objected to this practice because it was in violation of Bruker policies and SEC revenue-recognition and reporting standards for publicly traded companies such as Bruker. Wussow stated squarely to Szulczewski that he would not participate in such activities and would not instruct other FMBU employees to participate in them.

39.     Szulczewski reacted to Wussow's refusal to participate in Szulczewski's plans to falsify the basis for FMBU revenue recognition by screaming at Wussow—in violation of Bruker's policy against aggressive and belligerent verbal abuse -- claiming that Wussow did not know what he was talking about and was not a team player.

40.     At a subsequent manufacturing meeting in August 2014, Wussow read the portions of defendant Bruker's SEC Form 10-K filing stating the company's policy of recognizing revenue only after actual delivery and installation had been completed and formal customer acceptance acknowledging the completion of those steps had been obtained. Wussow told the meeting

participants that the FMBU was not operating in line with either the letter or spirit of this official revenue-recognition policy and that, based on Wussow's business school training, the FMBU's practices in that regard were improper.

41.     During the remainder of the third quarter, however, the FMBU, pursuant to defendant Szulczewski's orders, continued to implement his plan to generate premature revenue recognition by obtaining final customer sign-offs on systems in advance of actual installation and training. In early September 2014, with the FMBU yet to have recognized 75 percent of its $4 million revenue goal for the third quarter, Szulczewski ordered Wolf, Barrett, and other FMBU staff members to generate at least 25 percent of that shortfall by "arrang[ing] customer acceptances of the goods prior to installations."

42.     As a result of Szulczewski's orders, a Columbia University customer was then persuaded to give a final sign-off on September 29, 2014—one day before the third quarter ended—on a system that was not installed until October 2, 2014. Similarly, sign-off was obtained from a customer at Children's Hospital of Philadelphia on a system that was delivered on September 26, 2014, but was not installed until mid-October 2014.

43.     Realizing that his attempts to end such practices at the FMBU level had produced no results, Wussow decided to contact Stacy Waller, the FMBU's "partner" and primary contact with the Human Resources Department of Bruker Nano Inc.

44.     At a meeting with Waller on September 11, 2014, Wussow informed

15

her of the FMBU's regular practice of procuring customer acceptances and reporting revenue recognition in advance of the time permitted by Bruker's own policy and the SEC's revenue-recognition standards. On September 12, 2014, Wussow forwarded to Waller a September 2, 2014 email in which FMBU business manager Wolf had explicitly confirmed that the FMBU was engaging in this practice. On September 25, 2014, Wussow and Waller had a follow-up conversation regarding Wussow's report. Wussow also complained to Waller on October 20-21, 2014 that Szulczewski was being abusive and attacking his character, which was a direct result of Wussow objecting to his requests for improper revenue recognition.

**2014-- Fourth Quarter (October - December 2014)**

45.     On October 28, 2014, defendant Szulczewski was removed as General Manager of the FMBU and replaced by defendant Minne.

46.     Like Szulczewski, Minne had his own incentives to produce the higher revenue results being demanded of FMBU. Upon information and belief Minne's annual bonus was tied in part to his ability to meet specific revenue goals, and he was also under particular pressure to make good on promises he had made to Bruker management regarding the wisdom of adding another newly-acquired company to the FMBU, along with Szulczewski's Prairie Technologies, and Minne's ability to successfully integrate the newly assembled business unit into the Bruker organization.

47.     In a meeting with plaintiff Wussow on November 11, 1014, Minne

abruptly informed Wussow, without explanation, that he was no longer to involve himself with the scheduling or monitoring of FMBU engineering projects, as he had been doing since his hire as the FMBU's Director of Product Line Management. Wussow responded by pointing out that these activities were essential functions of his position and a central part of the management-system goals and objectives on which his job performance in 2014 would be measured, which would in turn have a direct effect on his bonus compensation for that year.

48.     Defendant Minne replied that he "did not care" about that and ordered Wussow in no uncertain terms to do as Minne had told him to do. Minne made it abundantly clear to Wussow that his performance assessment for 2014—and thus his bonus—were now under Minne's control and were "open to interpretation" and that Wussow had to do exactly as Minne had ordered or the result would be a negative performance review.

49.     At an impromptu meeting called by defendant Szulczewski later that same day, Szulczewski gave FMBU staff instructions about revenue recognition in the remainder of the fourth quarter, which again made clear that obtaining premature customer sign-off in order to enhance current revenue figures remained required practice in the FMBU.

50.     During a scientific conference the following week, Wussow spoke to defendant Minne about his concerns regarding the FMBU's premature revenue-recognition practices in light of defendant Szulczewski's instructions at the impromptu meeting on November 11, 2014. **Wussow told Minne that he**

believed the FMBU was violating Bruker policies and SEC regulations and guidelines by asking its employees to falsify company forms, and that the FMBU and therefore Bruker itself—was illegally misrepresenting its actual revenue to shareholders and potential investors because the revenue the FMBU was reporting was not being recognized in accordance with the revenue-recognition principles stated in defendant Bruker's Form 10-K submissions to the SEC.

51.     **Wussow gave the specific example of the Stanford--Marshall order where there was early sign off on a system that has still not completely shipped and was still waiting installation—even though revenue had been recognized the previous third quarter.**

52.     In response, Minne told Wussow that he "did not have a problem" with this practice and that other parts of the Bruker organization did the same thing. Minne stated that the most important thing was that the FMBU's bookings and revenue-recovery plan succeed and thereby meet the unit's quarterly revenue goals. Wussow responded by telling Minne that he was not willing to engage in such activities, which he considered to be unethical and illegal.

53.     After his conversations with defendant Minne in mid-November 2014, Wussow was cut out of almost all discussions and communications within the FMBU regarding revenue recognition, and the unit's practice of obtaining premature customer acceptance in order to enhance its revenue performance continued through the fourth quarter of 2014.

54.    In December 2014 the FMBU recognized fourth quarter revenue from a system produced for Virginia Tech by procuring the customer's acceptance upon the system's delivery, even though the parties were aware that the facility housing the new system would not be ready until January 2015 and the system would actually be installed in the first quarter of that year. Similarly, in December 2014 the FMBU was planning to seek post-delivery sign-off and revenue recognition in that month on another system for Columbia University, despite the fact that the unavailability of a critical component meant that actual installation could not occur until sometime in 2015.

**2015--- First Quarter (January – March 2015)**

55.    During the first several months of 2015, defendant Minne ordered Wussow not to participate at all in any manufacturing meetings or sales calls, but Wussow learned by other means that the FMBU's practice of seeking final customer sign-off in advance of complete delivery or installation continued unabated during the first quarter of 2015. Wussow was suddenly asked to participate in all sales calls at the end of February.

56.    Delivery of a system ordered by New York University in late February 2015 was delayed until the end of March 2015 because the facility housing it was not yet ready. At the FMBU's request, the customer supplied a final acceptance after delivery, while actual installation occurred after March 31, when the first quarter ended.

57.    Because the FMBU's revenue remained low in the first quarter,

defendants Szulczewski and Minne also offered special pricing to David DiGregorio, a longtime collaborator and friend of Szulczewski at the Institute Pasteur in France, to induce him to order an FMBU system for delivery in the first quarter of 2015.

58.     In order to finalize that order and configure the new system in time for shipment by the end of the first quarter, Minne brought plaintiff Wussow back in to assist with expediting the order between late February and March 13, 2015, after which Wussow left to help install the Stanford-Marshel system for which the FMBU had recognized revenue in mid-2014, as set forth above. On March 12, 2015, Minne also ordered John Rafter to contact DiGregorio on March 13, 2015, to obtain the final purchase order for the Institute Pasteur system and obtain DiGregorio's commitment to give final sign-off on the system after delivery by the end of the first quarter, but prior to the system's installation.

59.     The FMBU could not build the system in time to deliver it fully assembled by the end of March 2015, however. Some parts were backordered and not available for assembly. Desperate to recognize the system's revenue in the first quarter, defendants Minne and Szulczewski and John Rafter then ordered FMBU employees to box and ship available components of the uncompleted system by the end of March, and to falsify the shipping documents to make it appear that a completed system was being shipped.

60.     That shipment never made it through customs, however, because of the discrepancy between the shipping documents showing a completed

system and the actual contents of the boxes. As a result, the shipment was not actually delivered to the customer by the end of the first quarter and, instead, all boxes were returned to the U.S. The excuse that Minne, Szulczewski and John Rafter used for the shipment not getting through was that the system was not CE marked, which was not the real reason.

**2015– Second Quarter (April-May 2015)**

61.     After learning of these events on his return from California, plaintiff Wussow again made clear to other employees in the FMBU that he would not tolerate such behavior, but these events also reconfirmed his conviction that he could not hope to alter these practices at the FMBU level and needed again to report them to higher levels of the Bruker organization.

62.     On May 13, 2015, Wussow met again with the FMBU's Human Resources representative, Stacy Waller. Wussow informed Waller again of the FMBU's illegal actions with regard to the Institute Pasteur project, and Wussow asked Waller to make sure that she passed this information on to the appropriate next higher level of Bruker management.

63.     Waller attempted to call Wussow about a week after their meeting, on May 19, 2015, but Wussow was unavailable because of an emergency at a trade show in Barcelona. Wussow received no further communication from Waller regarding the information he gave her in their May 13, 2015 meeting, or regarding her efforts to report to higher levels of management within the organization.

64.     During June 2015 a system ordered by Washington State University

and originally scheduled for shipment on June 18 and installation on June 23 was lost in shipment and then accidentally shipped to Canada. Defendant Szulczewski nevertheless ordered FMBU employees to obtain the customer's final sign-off, and revenue for the system was recognized in the second quarter of 2015.

65.     After the original shipment errors were corrected, however, and the system was shipped to the customer in Washington, it arrived heavily damaged and was rejected. The FMBU was required to build an entirely new system to fill the order, and filed a damage claim with the shipper.

66.     Defendant Szulczewski was subsequently confronted by Paula Pierson, a Senior Accountant for Bruker, on or around July 2015, who asked him why the FMBU had a damaged-in-shipment claim pending for a system for which the customer had already signed off acknowledging satisfactory delivery and installation. Szulczewski was forced to admit to Pierson that the FMBU had asked for and received a premature acceptance by the customer.

**2015        – Third Quarter (July 2015)**

67.     In another in-person meeting with HR representative Waller on July 8, 2015, plaintiff Wussow reported the FMBU's violations with regard to the Washington State project. Waller agreed that the actions were becoming more reckless and the situation was not improving. However, she did not make any specific promise about what she would do with the information.

68.     On July 28, 2015, Wussow was summoned to a meeting with Steve Minne in person and Stacy Waller on the phone and summarily terminated

from his position as Director of Product Line Management. Wussow was given a letter signed by Larry House, Vice President, Human Resources, Bruker Nano Group, claiming that Respondent Bruker Nano Inc. had decided to "restructure and reduce the number of employees in its Nano Surfaces Division" and that his employment was "being terminated as part of this reduction." Wussow was not in any way informed that his termination was based in whole or in any part on defendants' evaluation of his job performance, which had been positive.

69.    On information and belief, no employee in the Bruker Nano Services Division—including all other employees in the FMBU—other than plaintiff Wussow was selected for termination in the purported "restructuring" through which Wussow was purportedly terminated. On information and belief, none of the employees who were retained in this manner had made any report or complaint or otherwise provided information regarding unlawful activity, as plaintiff Wussow had, in the manner provided in 18 U.S.C. § 1514A(a).

70.    The reason Wussow was given for his termination at the July 28, 2015 meeting was pretextual. Wussow was in fact terminated because he had reported, opposed, and provided information regarding the FMBU's premature customer acceptance and revenue recognition practices, in the manner provided in 18 U.S.C. § 1514A(a). Wussow's protected activities in this regard were a contributing factor in his discharge and other adverse actions taken against him.

71.    During the July 28, 2015 meeting at which he was terminated, Wussow asked for a meeting with Vice President House.

23

72.     In a telephone conversation with House the next day, July 29, 2015, Wussow fully informed House of his information and concerns regarding the FMBU's practice of obtaining premature customer acceptance of Bruker systems in order to recognize revenue prior to the time permitted by Bruker's own policies and the standards promulgated by the SEC. He told House that he believed that his termination was directly the result of his reporting and opposing and being unwilling to participate in the illegal revenue recognition practices directed by Minne and Szulczewski.

73.     On August 3, 2015, plaintiff Wussow received an email from Mike Barry, informing Wussow that Barry was defendant Bruker's Senior Director of Internal Audit and that Barry also handled "Ethics/Whistleblower reports and allegations." Barry's email expressed no interest in exploring the timing or grounds for Wussow's recent termination, however, and instead claimed that Barry wanted additional information about Wussow's report to House and insisted that, "Bruker takes these issues very seriously."

74.     On September 1, 2015 plaintiff Wussow filed a timely administrative complaint of retaliation under 18 U.S.C. § 1514A with the federal office of Occupational Safety and Health Administration, or OSHA. More than 180 days has passed since the filing of the complaint without a determination being reached by OSHA. Thus, plaintiff has complied with all administrative prerequisites to a federal civil action under the SOX retaliation provision.

## RETALIATION CLAIM UNDER 18 U.S.C. § 1514A

75.     Plaintiff Wussow realleges each of the preceding paragraphs 1--74 as though set forth herein.

76.     By opposing, reporting and providing information regarding the FMBU's premature customer acceptance and revenue recognition practices in the manner set forth above, plaintiff Wussow engaged in activity protected from discrimination and retaliation by 18 U.S.C. § 1514A.

77.     The adverse actions against Wussow set forth above, including but not limited to berating him for opposing, reporting and refusing to participate in the FMBU's improper and illegal customer acceptance and revenue recognition practices, forbidding him to perform critical job functions and isolating him from meetings, communications and other interactions that were essential to the effective performance of his job, and terminating his employment, were engaged in by defendants Szulczewski and Minne and by defendants Bruker and Bruker Nano, acting through Szulczewski, Minne and other of their authorized agents, officials and employees, because of plaintiff's protected activity under 18 U.S.C. § 1514A.

78.     By taking these adverse actions because of plaintiff Wussow's protected activity, as set forth above, defendants discriminated and retaliated unlawfully against Wussow in violation of 18 U.S.C. § 1514A.

79.     Defendants' violations of 18 U.S.C. § 1514A, as set forth above, caused Complainant Wussow to suffer substantial damages, including but not

limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Wussow will continue to suffer these damages in the future.

## RETALIATION CLAIM UNDER 15 U.S.C. § 78u--6(h)(1)(A)(iii)

80.     Plaintiff Wussow realleges each of the preceding paragraphs 1--77 as though set forth herein.

81.     By opposing, reporting and providing information regarding the FMBU's premature customer acceptance and revenue recognition practices in the manner set forth above, plaintiff Wussow engaged in activity protected from discrimination and retaliation by 15 U.S.C. § 78u--6(h)(1)(A)(iii).

82.     The adverse actions against Wussow set forth above, including but not limited to berating him for opposing, reporting and refusing to participate in the FMBU's improper and illegal customer acceptance and revenue recognition practices, forbidding him to perform critical job functions and isolating him from meetings, communications and other interactions that were essential to the effective performance of his job, and terminating his employment, were engaged in by defendants Szulczewski and Minne and by defendants Bruker and Bruker Nano, acting through Szulczewski, Minne and other of their authorized agents, officials and employees, because of plaintiff's protected activity under 15 U.S.C. § 78u--6(h)(1)(A)(iii).

83.     By taking these adverse actions because of plaintiff Wussow's protected activity, as set forth above, defendants discriminated and retaliated

unlawfully against Wussow in violation of 15 U.S.C. § 78u--6(h)(1)(A)(iii).

84.     Defendants' violations of   15  U.S.C.  §  78u--6(h)(1)(A)(iii),  as  set forth  above,  caused  Complainant  Wussow  to  suffer  substantial  damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Wussow will continue to suffer these damages in the future.

## JURY DEMAND

85.     The  plaintiff  hereby  demands  that  the  issues  in  the  above-captioned matter be tried by a jury.

WHEREFORE, the plaintiff demands judgment and relief on all of his claims as follows:

A.     Reinstatement  to  his  former  position  with  all  benefits  of employment plaintiff would have enjoyed but for defendants' discrimination and retaliation, or in the event that such relief is determined to be impracticable, an award of front pay in an amount sufficient to make plaintiff whole;

B.     Back pay, with interest;

C.     Double back pay under 15 U.S.C. § 78u—6(h)(1)(C)(ii);

D.     Compensation in an amount to be determined for the special and other  damages  plaintiff  has  sustained  including  without  limitation  his reputational and earning capacity losses and emotional distress;

E.     Plaintiff's reasonable attorney's fees and costs incurred in bringing

this action; and

F.     Such other relief as this tribunal deems just and proper.

Dated at Monona, Wisconsin this 23rd day of June, 2016.

Respectfully submitted:

FOX & FOX, S.C.

S/ Mary E. Kennelly

_____

Mary E. Kennelly
SBN # 01019036
124 West Broadway
Monona, Wisconsin 53716
Telephone: 608/258-9588
Facsimile: 608/258-9105
Email: mkennelly@foxquick.com